**DE CASTRO LAW GROUP, P.C.**
José-Manuel A. de Castro (SBN 213769)
7590 N. Glenoaks Blvd., Suite 201
Los Angeles, CA 91504
Telephone: (310) 270-9877
Facsimile: (310) 341-2330
Email:  jmdecastro@decastrolawgroup.com

**OTTERBOURG P.C.**
Adam C. Silverstein
230 Park Avenue
New York, NY 10169
Telephone: (212) 905-3628
Email:  asilverstein@otterbourg.com
*Pro Hac Vice admission pending*

Attorneys for Plaintiff Iraj Parvizi

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IRAJ PARVIZI, an individual,<br><br>         Plaintiff,<br><br>    vs.<br><br>CREATE MUSIC GROUP, INC., a Delaware Corporation,<br><br>         Defendant. | Case No:  **2:20-cv-09059**<br><br>**COMPLAINT FOR RESCISSION AND ALTERNATIVE RELIEF**<br><br>**[REQUEST FOR JURY TRIAL]** |

Plaintiff IRAJ PARVIZI ("Parvizi" or "Plaintiff"), as and for his complaint against Defendant CREATE MUSIC GROUP, INC. ("CMG" or "Defendant"), hereby alleges as follows:

## NATURE OF THE ACTION

1.     After seizing on the pandemic-related financial distress of one of its major stockholders (Plaintiff), an early stage company (Defendant)—knowing, or recklessly disregarding the fact that, it did not have the ability fully to perform— induced the stockholder to sell back the vast majority of his shares to the company at an opportunistically low price.  By this action, the stockholder seeks to rescind the

stock repurchase agreement that the company did not, and still cannot, perform.

2.     The parties' stock repurchase agreement—agreed upon at or near the depth of the global financial market's reaction to the COVID-19 pandemic—provided for the Defendant's repurchase of so many of the Defendant's shares of preferred stock as to leave him, after the sale, with 9% of the company's stock on a fully-diluted basis, for a total of $10,000,000, originally to be paid by May 15, 2020, and subsequently agreed to be paid on or before June 15, 2020.  The parties' words and actions, before, during and after entering into the agreement, made clear that the timing of the closing—which drove the transaction in order to give Plaintiff liquidity he desperately needed due to the pandemic market crash in return for selling shares to Defendant at a favorable price—was critical.

3.     Unbeknownst to Plaintiff, at the time that it originally entered into the stock repurchase agreement, Defendant did not have the ability to perform it.  Rather, Defendant, without telling Plaintiff at the time, needed to procure millions of dollars of third-party financing in order to be able to pay for the shares that it had agreed to purchase.  More, even though *Defendant* subsequently prepared the terms of the written memorialization of the agreement without any negotiation or input from the Plaintiff, Defendant did not provide for any contingency for third-party financing in the written agreement.  Defendant did, however, use the opportunity of unilaterally drafting a long-form agreement to include numerous provisions that it had never discussed with Plaintiff, by which Plaintiff (who was unrepresented by counsel) conditionally waived a number of valuable investor rights under the preferred stockholder agreement governing his share ownership in exchange for the (unfilled) consideration Defendant had promised him.

4.     Not until July 29, 2020—six weeks after the agreed-upon adjourned closing date and four weeks after Plaintiff had delivered a notice of breach to Defendant based on Defendant's failure to deliver the agreed-upon consideration—did Defendant indicate that it finally had procured the third-party financing it

COMPLAINT FOR RESCISSION AND ALTERNATIVE RELIEF
Case No.  2:20-cv-09059

required in order to close on the share repurchase and, thus, was ready to deliver the full purchase price.  But, even then, there was a catch.  Defendant refused to close unless Plaintiff first signed an amendment to the stock repurchase agreement postponing the closing date from June 15, 2020 to July 30, 2020.  Plaintiff was under no obligation to sign, and did not sign, the amendment, which effectively sought to waive a material term of the agreement and rewrite the agreement to condition Defendant's closing obligation on its first having obtained third-party financing.

5.     To date, Defendant has not performed, and apparently still cannot perform, its central obligation under the stock repurchase agreement, *i.e.,* to pay to Parvizi a total of $10 million for his shares.  At this time, more than two and one-half months after the closing date, the Defendant has paid Plaintiff only $3 million of the $10 million it committed to pay by June 15, 2020, and the Plaintiff has signed over none of his shares to Defendant.   Given the utter failure of the central consideration—$10 million by June 15, 2020—and for other reasons, the Plaintiff seeks, and is entitled, to rescission of the stock repurchase agreement, for which he will return the $3,000,000 he has received, in order to restore the parties to the positions they respectively were in before they entered into the agreement.

## THE PARTIES

6.     Plaintiff Iraj Parvizi is, and at all relevant times has been, a British citizen and resident of Dubai.  By virtue of his and/or his daughter's private equity investments (Parvizi having later acquired shares from his daughter) in the company, immediately prior to the transaction at issue, he owned 54,758,077 of the company's Series Seed Preferred Stock, representing, according to CMG, over 30% of the company's "total fully diluted shares."   Plaintiff's Series Seed Preferred Stock ownership is governed by the terms of a Series Seed Preferred Stock Agreement, dated August 26, 2015, which provides the holders of such shares (including Plaintiff), among other things, enhanced information rights, preemptive rights, most favorite nation rights, participation rights and voting rights.  From at least February 1,

2017, through at least May 6, 2020, Plaintiff served as a member of the Board of Directors of CMG.  The written stock repurchase agreement of which Plaintiff seeks rescission provides, by its terms, for Plaintiff's resignation from the Board of Directors.

7.     Defendant CMG is, and at all relevant times has been, a corporation organized under the laws of Delaware, having its principal place of business at 1320 N. Wilton Place, Los Angeles, CA 90028.  Defendant is a self-described "data-driven music and technology company" that "provide[s] best-in-class technology for [its] artists and labels," providing them with a "suite of tools and services [that] cover[] distribution, publishing, sync licensing, digital rights management, A&R and marketing, and recording services."  On August 12, 2020, it announced that it had landed the number 2 spot on *Inc.* magazine's annual "Inc. 5000 List," which Defendant characterizes as "the most prestigious ranking of the nation's fastest-growing private companies."

## JURISDICTION AND VENUE

8.     Jurisdiction in this Court is proper pursuant to 28 U.S.C. §1332(a)(2), in that this is a civil action (a) where the matter in controversy exceeds the sum or value of $75,000, and (b) which is between a citizen of a State and a citizen or subject of a foreign state who is not (i) permanently admitted for residence in the United States and/or (ii) domiciled in the same State as the other party.

9.     Venue is proper in this District pursuant to 28 U.S.C. §§1391(a) and (b), in that (a) the Defendant is a resident of this District, and (b) a substantial part of the events or omissions giving rise to the claims alleged herein occurred within this District.  Additionally, the parties agreed in the written contract at issue:

> This Agreement shall be deemed to have been made in the County of Los Angeles, California, and any and all enforcement of any of the provisions of this Agreement, including attempts to deal with any real or perceived breach of this Agreement, shall take place within the County of Los Angeles, California.  Each of the Parties hereto expressly and irrevocably

consents to the exclusive jurisdiction and venue of any competent State or Federal court located within the City and County of Los Angeles, California.

## FACTUAL BACKGROUND

### A.   Events Preceding Execution of the Written Stock Repurchase Agreement

10.    The stock purchase agreement that is the subject of this action was uniquely a product of the COVID-19 crisis.

11.    Due to a sudden and unexpected liquidity need resulting from extraordinary global market volatility following the onset of the pandemic, Parvizi, at the end of February 2020, contacted the CEO of CMG, Jonathan Strauss, and asked if the company could extend a loan to him of up to $1 million.  Given the historically low borrowing costs and favorable share prices resulting from the pandemic, the company perceived a unique opportunity to leverage its largest outside investor's dire need for liquidity into a buy-back of its own shares at an unusually depressed price.

12.    Repurchasing a significant portion of the equity held by Parvizi, who was neither a marquise name nor a strategic partner but who, as one of the first outside investors, received significant investment rights, would free up space in its capital structure for a long sought-after strategic investor.  As Strauss put it in a text to Parvizi: "I honestly think we can raise at a really high amount," but "I do think we need someone strategic on our cap table though to get what I think we can get in 6 months – year."

13.    Within a matter of weeks after Parvizi's request of CMG for a loan, on or about March 24, 2020, the parties reached an agreement.  Parvizi had been reluctant to sell a sizeable portion of his equity in a fast-growing company about whose prospects he was bullish, but the company had presented a sale of his equity back to it as a win-win:  His significant cash-out would provide him with more than enough liquidity, while, according to the company, its buy-back of shares would

enable the company to obtain a strategic investor at a higher valuation that would benefit all shareholders, including Parvizi, by virtue of his post-sale residual stock holding. Parvizi's belief that, by agreeing to sell his shares at a discount, he was doing the right thing not only by himself but also by the company is reflected in his contemporaneous texts. He texted Strauss right before agreeing: "Hey Johnathan I know me doing this deal is good for the company so I'm gonna ask you to take care of my side of the deal!"

14. The terms of the deal were basic,  and confirmed in a written exchange of e-mails and telephone conversation on or about March 24, 2020.  Strauss e-mailed to Parvizi:

"Hey Iraj!

Can't wait to see you in June/July when this madness is all over. I wanted to counter to something pretty close to what you asked but works best for the company during this time. I could probably get 2M out right away (this week) from our existing account balance.

10,000,000 Purchase Price and you would own 7% of the fully diluted shares of CMG afterward.

I know how much you love the company and having you be a part of it for the long-haul is something Alex [Williams, COO] and I want as well. I think this is a win-win for everyone and if it works I'll approve the debt side right away to get that moving fast."

15. Parvizi replied:

"Hey Johnathon

Make it 9% and we have a deal! I will
Quickly explain why, my youngest daughter
Sophie thinks I'm mad as she loves the
Company and I want me and the girls to
Have 3% each! Believe me under different
Circumstances I wouldn't be doing this
Deal but I really don't have my choice now

The [currency exchange] rate is already gone up to 118 from 114
So need this to happen quick above 120
It really don't look attractive

6

I'll give you my uk bank details if we are good
To go

Make it work
Iraj"

16.    Strauss then sealed the deal:

"I certainly hope she is right! Let's do it and I'll try to expedite as quickly as possible . . . "

17.    Nowhere in the e-mail exchange did the company disclose that, in fact, it did not have the ability to pay $10 million for Parvizi's shares.  Nor did it condition its obligation to purchase Parvizi's shares for $10,000,000 either on the execution of a signed agreement or on its closing on third-party financing.

18.    By the parties' binding and enforceable agreement (confirmed by an exchange of writings) (the "March 24 Agreement"), Parvizi thus agreed to sell so much of his equity in the company in order to leave him owning 9% of the company's equity on a fully diluted basis, in exchange for CMG's agreed to pay a total of $10 million, in a two-step transaction culminating no later than May 15, 2020.  In the first step, the company was to pay Parvizi $2 million for shares within a matter of days; and, in the second step, the company was to pay the remainder of the money ($8,000,000) for the remaining shares "as quickly as possible."

19.    In fact, the timing of the cash payments was critical to Parvizi, for at least two reasons, and he made that abundantly clear to the company.  First, during the weeks that he was discussing the potential share transfer transaction with Strauss and CMG's COO, Alexandre Williams, in March, market conditions continued to worsen due to the spread of COVID-19 and Parvizi's need for immediate liquidity increased.  Therefore, Parvizi's timely receipt of payment in order to abate his significant liquidity needs became an essential basis of the bargain for his agreement to sell shares to the company at what he perceived to be a substantially depressed price—well below the price at which he had sold shares of preferred stock to the

company less than a year earlier.  Second, at the same time that the pandemic was putting downward pressure on equity prices, it also was weakening the U.S. dollar. Thus, in a dollar-based transaction, capitalizing on a favorable dollar-to-pound-sterling exchange rate was essential to enabling Parvizi, at least partially, to offset the unfavorable price at which he agreed to sell his shares.  As Parvizi wrote to Strauss in a text:  "Only works because of currency so let's hope it don't move."

20.    Additionally, the pricing of the transaction was closely tied to the specific circumstances at the time, namely, the global market's reaction to the COVID-19 pandemic.  On January 2, 2020, the Nasdaq Composite Index—the stock index that companies like the Defendant typically get listed on when they go public—closed at 9,092.19.  At the close of trading on March 23, 2020, the price of the Nasdaq Composite Index was 6,860.67—a 25% decline in the span of less than three months.  Given the circumstances, it was not surprising that, notwithstanding that CMG continued to grow year-over-year as measured by multiple metrics, the price at which Parvizi agreed to sell his shares was *lower* than at which he sold shares to the company less than a year earlier.

21.    The day after the deal was struck, on March 25, 2020, Parvizi e-mailed to Strauss, requesting that "[a]s promised, please can you send the $2million this week," providing wiring instructions and reiterating that  "[a]s I explained, the rate is currently going against me, so need to get it done as soon as possible."  CMG's counsel, Jonathan Atzen, replied that he was working on a written stock purchase agreement that he would forward when ready and asked Parvizi for the name of his lawyer to whom he should send the draft.  Parvizi responded:  "I don't have counsel and don't need one I trust the boys your end."  In fact, Parvizi never did engage counsel to represent him in connection with the stock repurchase agreement, and CMG knew that.

22.    Later that night (California time), Atzen e-mailed to Parvizi an initial draft of a written Stock Purchase Agreement.  The draft provided for Parvizi to sell to

CMG a total of 39,264,663 shares of Series Seed Preferred Stock, in two steps: (i) a sale of 7,852,933 shares of preferred stock for $2,000,000 upon an initial closing; and (ii) a second sale of 31,411,730 preferred stock upon a second closing on May 15, 2020. It also contained pages of single-spaced terms, including the forfeiture of significant investor rights under the preferred stock agreement, that Parvizi had never discussed with either Strauss or Williams and which appear nowhere in the parties' exchange of e-mails.

23. After receiving the draft, Parvizi wrote to Strauss and Williams by text: "Hi boys I've seen the agreement and because of my financial situations I don't really have my choice! I do think the company is worth 200m but what can I do except hope that you guys are looking after my interest! I was there for you guys in 2015 closed my eyes and trusted both of you so I will do the same and hope you've got my back and look after my interest now."

24. The next morning (California time), on March 26, 2020, Atzen e-mailed to Parvizi a revised draft Stock Repurchase Agreement, increasing (without any explanation whatsoever) the total number of shares to be sold by Parvizi to the company by nearly 4,000,000 shares. The revised draft provided for the sale of a total of 43,153,077 shares of Series Seed Preferred Stock for the same total purchase price of $10,000,000—8,630,615 shares to be sold for $2,000,000 upon an initial closing, and 34,522,462 to be sold for $8,000,000 upon a final closing on May 15, 2020. (When Parvizi later questioned Atzen and Strauss why the number of shares changed from one draft to the next, he never received an answer.) Among other revisions, Atzen also included that Parvizi would be giving up his seat on CMG's Board of Directors. Atzen indicated that the draft remained subject to CMG's review, comment and approval, and that a wire transfer would be initiated only after the agreement was "signed off."

25. When Parvizi saw from Atzen's e-mail that he might not receive the upfront money he was promised on the schedule that he was promised it, he

threatened to withdraw from the deal, reemphasizing the urgency of timing.  He replied to Atzen: "I was told the 2m was being sent [but] from your email it looks like it still hasn't so I'll just wait and decide after all this virus is over."  He separately texted Strauss and Williams: "Hi guys thanks trying to help but I just got email from JA that nothing will be sent til documentation signed so let's forget about the deal for now!  I'm sure I'll survive."

26.    Anxious not to jeopardize the sweetheart deal that the company, taking advantage of Parvizi's dire liquidity need, had just struck substantially to reduce Parvizi's equity holding at a depressed price, CMG assured Parvizi that it would wire the $2,000,000 that day, *without* having a signed agreement.

27.    CMG, however, wired only $500,000 of the $2,000,000 on March 26, 2020, leading Parvizi to barrage Strauss and Williams with texts seeking the remainder of the initial $2,000,000 and threatening to walk away from the deal due to the delay.  "[N]ever mind the other 8m!," Parvizi texted.  Days later, on or about April 1, 2020, determined not to give Parvizi any reason to walk away from the deal by virtue of its delay, CMG wired the remaining $1,500,000 to him, again *without* a signed agreement.

28.    In the weeks that followed, during the first half of April, Parvizi relentlessly inquired when the company would be able to consummate the deal, which it had promised to complete by May 15, 2020.  On April 8, he texted to Williams:  "Hey Alex do we have a date for closing the deal yet?"  On April 15, he sent another text to Williams:  "Hey Alex do you have any update where we are yet?"  Then the next day:  "I guess you don't know either."   By e-mail two days later, Parvizi explained the reliance he had been placing, and was continuing to place, on the CMG's time commitment:  "On the back of what you guys tell me I make commitments then I have to make excuses why no funds."  He added:  "I agreed the deal when sterling was 1.15 it's now 1.25 that a big difference."  In fact, Parvizi did rely on CMG's promise and agreement to pay him $10 million in managing his

COMPLAINT FOR RESCISSION AND ALTERNATIVE RELIEF
Case No.  2:20-cv-09059

liquidity needs and in taking on financing costs, timed to be paid off and satisfied by May 15, 2020.

29. CMG sought to assuage Parvizi's concerns about delay by committing to wire him an additional $500,000, which it did on or about April 29, 2020, bringing the total wired to Parvizi further to the parties' March 24 Agreement to $2,500,000. CMG also gave no indication that it would not be able to close, as agreed, on May 15, 2020.

30. Yet CMG did not, and would not sign, the Stock Repurchase Agreement that its own counsel, Atzen, had drafted and e-mailed to Parvizi on March 26, 2020. Rather, the company decided it would not commit in a signed agreement to pay Parvizi $8,000,000 by May 15, 2020, unless and until it was certain it could fulfill that commitment, which it eventually disclosed to Parvizi was dependent on third-party financing.

31. Parvizi began imploring CMG to send and sign a written contract memorializing the agreement that they had reached.  On or about April 21, 2020, Parvizi texted to Strauss: "Hey Johnathan hope your feeling better everyday! Whenever your ready get the contracts drawn up and I'll sign it all over to you! Have a nice weekend."

32. On or about April 23, 2020, nearly a month after the deal was struck and after CMG had wired an initial installment under it, CMG's counsel, Atzen, e-mailed to Parvizi a further revised draft of the written Stock Repurchase Agreement, reflecting that the initial payment for shares would total $2,500,000 (instead of $2,000,000) and providing for a final closing payment of $7,500,000 on June 15, 2020 (instead of May 15, 2020).

33. Parvizi was shocked and dismayed by the delay in the closing date.  He immediately texted Strauss: "Got the e-mail I'm going to listen to JA's advice and get a lawyer to go through contract! [He never did] One question I have for you Johnathan when we discussed deal it was completion 15th of may in the email I got

11

COMPLAINT FOR RESCISSION AND ALTERNATIVE RELIEF
Case No. 2:20-cv-09059

today it says 15th June is that a miss print?"   Strauss responded that "[i]t's all based on the lender" and that Atzen was "trying to play it safe."   Parvizi remained in disbelief: "Not sure if I'm going mad or just forgetful did you mention 15th may to me?  Because I told the company I owe money to I would paying them on 15th may."  Strauss sheepishly replied: "At least it's 7.5M/2.5M instead of the 2M/8M like we said."  Strauss also tried to comfort Parvizi on timing: "Maybe it happens sooner."

34.    Having made financial commitments based on the company's agreement to consummate the purchase of shares by May 15, 2020, and having to scramble now to adjust to the delay (which cost him significantly), Parvizi indicated he was ready to sign the written agreement based on an outside closing date of June 15, 2020:  "Let's get these contracts signed I still haven't received docusign."  On May 5, 2020, Parvizi wrote again:  "Hey Johnathan I hope you are well I still haven't received any documents to sign."

35.    That night, Atzen e-mailed to Parvizi another revised draft Stock Repurchase Agreement—this one like each of the prior versions reflecting no comments or input from Parvizi.

36.    The following day, only when *CMG* believed (wrongly as it turned out) that it could fulfill its written closing obligation of June 15, 2020, Atzen e-mailed for electronic signature a final version of the written Stock Repurchase Agreement, which Parvizi, still without the benefit of any legal advice, immediately signed and returned.

## B.    The Executed Stock Repurchase Agreement

37.    The Stock Repurchase Agreement between Parvizi, as "Seller," and CMG, as "Buyer," dated as of May 6, 2020 (the "Signed Agreement")—drafted by CMG's counsel without any input, comment or negotiation from the unrepresented Parvizi—was a second agreement between the parties for the company's repurchase of Parvizi's shares that, by its terms, replaced and superseded the March 24 Agreement.

38.     The Signed Agreement provides that "Buyer shall purchase and acquire from Seller, and Seller shall sell, transfer, assign, convey, set over and deliver to Buyer, all of Seller's right, title and interest in and to the Shares [defined as "Forty-Three Million One Hundred Fifty-Three Thousand Seventy-Seven (43,153,077) shares of Series Seed Preferred Stock"] in the manner and for the consideration set forth in Article 2 below"—*but only* "*[u]pon the terms and subject to the conditions hereof*, *and upon the basis of the agreements, representations, warranties and covenants contained herein, at Closing*."

39.     The Signed Agreement describes the "Conditions Precedent" to Seller's obligations as follows:  "At each Closing, the obligations of Seller hereunder are subject to the satisfaction of Seller's receipt of (a) the payment of the Initial Shares Purchase Price or the Final Shares Purchase Price (as applicable), and (b) all required consents or waivers from the transfer of the Shares."  The Initial Shares Purchase Price is defined as the "aggregate amount equal to Two Million Five Hundred Thousand Dollars ($2,500,000)"; and the Final Shares Purchase Price is defined as "Seven Million Five Hundred Thousand Dollars ($7,500,000)."

40.     As set forth below, these "Conditions Precedent" to Parvizi's obligations were not, are not, and cannot be, fully or even substantially satisfied.

41.     Per the Signed Agreement, "[c]onsummation of the transactions contemplated by this Agreement *shall occur* on the following dates: (i) the Effective Date (the 'Initial Closing') and (ii) on June 15, 2020 (the 'Final Closing').  The Initial Closing and the Final Closing may also each be referred to as a 'Closing.'"

42.     The Signed Agreement states that "Buyer has delivered to Seller . . . on or prior to the Initial Closing . . . the Initial Shares Purchase Price, with respect to the purchase of Ten Million Seven Hundred Eighty Eight Thousand Two Hundred Sixty Nine (10,788,269) shares of Series Seed Preferred Stock (the 'Initial Shares')."  It further provides that: "Buyer *shall* deliver to Seller . . . *on the Final Closing* [June 15, 2020] the Final Shares Purchase Price with respect to the purchase of the remaining

Thirty Two Million Three Hundred Sixty Four Thousand Eight Hundred and Eight (32,364,808) shares of Series Seed Preferred Stock (the 'Final Shares')."

43.   In its first two "Articles" of the Agreement, CMG's counsel memorialized the deal that the parties had struck on March 24, 2020, except as modified to reflect (i) two payments of $2,500,000/$7,500,000, instead of $2,000,000/$8,000,000, and (ii) final consummation on June 15, 2020, instead of May 15, 2020.  In five additional "Articles," CMG's counsel filled the Agreement with legal terms that the parties never discussed, negotiated or partially performed, and which Parvizi never engaged counsel to review.

44.   Articles 3 through 7 of the Signed Agreement provide, among other things, for:

- "*Additional Agreements and Covenants* of Buyer and Seller" incidental to the stock repurchase, including:

   - the conversion of "any and all remaining and/or existing shares of Series Seed Preferred Stock (including the Final Shares)" on a 1:1 basis into shares of CMG's Common Stock; and

   - waiver and release of sections 4, 6 and 7 of the Series Seed Preferred Stock Investment Agreement, dated August 26, 2015, by and between Buyer and Seller, including, among other things, information rights, preemptive rights, participation rights, most favorite nations rights and voting rights; and

- A one-sided release by Seller of any and all claims against Buyer and Buyer's "present or former directors, officers, attorneys, Company Counsel, managers, employees, members, agents, affiliated entities or representatives and employees."

45.   The Signed Agreement states that it "will be governed by and construed in accordance with the internal laws of the State of California without regard to its conflict of law rules."

46.     By Unanimous Written Consent of the Board of Directors, dated May 6, 2020, CMG's Board of Directors, among other things, unanimously approved and ratified the Signed Agreement, authorized and empowered the company's officers and directors to take such actions as necessary to effectuate the transactions contemplated in the Agreement, and ratified, confirmed and adopted all prior actions taken by the company's officers and directors in connection with the Agreement.

**C.     Events Immediately Following Execution of the Stock Repurchase Agreement**

47.     Following execution of the Signed Agreement, Parvizi immediately resumed his campaign to consummate the transaction as soon as possible.  In fact, instantly after signing and returning the Agreement,  he texted Strauss:  "All signed the date still said June pls if possible try to sort in may from 15th of may I'm on crazy penalties."

48.     The next week, on May 11, 2020, he texted Strauss again:  "Any idea what's earliest payment could be made.  As I said before from 15th May I'm on penalties If you have date in mind I'll try to see if I can get a better deal."

49.     The company continued to assure Parvizi that the deal would close promptly.  Strass responded:  "Absolutely.  Will send whatever is possible end of this week.  I'll keep you updated."

50.     On May 18, 2020, with no further information from the company, Parvizi texted Strauss again:  "Morning Johnathan one of my creditors giving me a headache about me being late paying him I owe him under 1.5m$ will you check to see if this could be done?  Only if it doesn't put you guys under pressure Thanks."  Unable to close at that point, but understanding Parvizi's urgency, Strauss responded the next day:  "We can do 500,000USD from our bank balance.  We don't have 1,5M to send out.  Let me know if that works and I can authorize."

51.     The following day, the company wired an additional $500,000 to Parvizi, bringing the total amount paid by the company to $3,000,000 of the

$10,000,000 purchase price.

52.     By early June, Parvizi, once again, was pressing for a closing date.  On June 2, 2020, he texted to Strauss:  "Morning sir;) realistically do you believe the completion date will be before the 15th?  Then I can stop bothering you constantly."  Strauss was hopeful, responding to Parvizi that "I am doing everything that I can to get any exact date for you."

53.     Days later, Parvizi reiterated "the pressure I'm being put under."  Strauss indicated he understood.  On June 11, 2020, he e-mailed Parvizi acknowledging the "urgency" and assuring Parvizi that he was "doing everything in my ability to make sure this is on time."  Nevertheless, while Strauss indicated he was "hopeful" the transaction would close on time, he also "predict[ed] this may take an additional week or two."

54.     Understanding and admitting that CMG's failure to close on June 15, 2020 would constitute a breach of the Agreement, Strauss acknowledged:  "Of course you are going to get the penalties so maybe there is something I can do to make it worth any third parties that have to wait. I was thinking an extra $20,000 per week."  Parvizi did not agree to any such remedy.

55.     On June 15, 2020, Parvizi, still eager to close on time, texted Strauss:  "Any luck boys?"    In fact, on that date, which, by the terms of the Signed Agreement, "[c]onsummation of the transactions contemplated by this Agreement *shall* occur," CMG was neither ready, willing nor able to close.  After informing Parvizi that the company did not have sufficient funds to close, Strauss profusely apologized and texted:  "If I had the money personally I would send right away."

56.     Days later, with the company still unready, unwilling and unable to close, Strauss texted:  "I will get the money soon.  We will quickly get past this but I do apologize again.  I hate that any of that is happening as you don't deserve it and we will make it right."  After more days passed without the company having the ability to close, Strauss assured Parvizi by text that both CMG's counsel and its bank

16

COMPLAINT FOR RESCISSION AND ALTERNATIVE RELIEF
Case No. 2:20-cv-09059

"know the urgency."

57.    By June 23, 2020, more than a week after CMG had committed to close the Signed Agreement, Parvizi indicated he would be engaging counsel.    He confirmed to Strauss what had already been obvious from their communications and the circumstances of the deal:  "I only agreed to the very low valuation because of speed of transfer!  Now it absolutely makes no sense."

58.    In order to satisfy the significant financial obligations he had incurred on the expectation of the company fulfilling its commitment to close the Signed Agreement on time, Parvizi was forced to liquidate assets, in fire-sale fashion, at below market prices and to take on additional financing costs, none of which he would have had to incur had the company performed its obligations.

**D.    The Company's Continued Breach of the Signed Stock Repurchase Agreement**

59.    By letter to Strauss as CEO of CMG dated June 29, 2020, newly engaged counsel for Parvizi notified the company that "Buyer, at a minimum, has fundamentally, materially and entirely breached and repudiated the Agreement by, at least, failing to deliver the Final Shares Purchase Price."  Parvizi's counsel further notified CMG that the circumstances suggested that "the Agreement may have been procured on the basis of fraud, in that it appears that Buyer entered into the Agreement with knowledge of, or reckless disregard for, its inability to perform its obligations thereunder."  In the letter, Parvizi "reserve[d] all his rights, at law or in equity, under the Agreement and otherwise, with respect to Buyer's material breaches of, and/or fraudulent conduct in procuring, the Agreement, including, but not limited to, indemnification of all of Seller's attorneys' fees and expenses in connection with same."

60.    CMG did not dispute or otherwise respond to the notice of breach.

61.    On July 19, 2020,  five weeks after the Final Closing in the Signed Agreement and with CMG still not ready, willing or able to close the agreement,

CMG's counsel—knowing, at that point, that Parvizi was represented by counsel—e-mailed to Parvizi, without copying his counsel, a draft First Amendment to Stock Repurchase Agreement "[i]n anticipation of the closing of CMG's [third party] financing this week." The draft amendment, if executed, would have (i) revised the Final Closing to July 24, 2020, and (ii) acknowledged Parvizi's previous receipt of $3,000,000.

62. Two days later, Parvizi's counsel, with "[a]ll rights reserved," provided to CMG's counsel revisions to the draft amendment, indicating that Parvizi was "prepared to execute the Amendment, as revised per the attached, without delay." As revised, the amendment that Parvizi was prepared to sign would have—exactly as CMG requested—postponed the Final Closing to July 24, 2020, and reduced the amount to be delivered, at the Final Closing, to $7,000,000, *but would have sprung into effect if, and only if,* CMG actually were to deliver the $7,000,000 on July 24, 2020. In the event that CMG was *not* ready, willing and able to pay the $7,000,000 on July 24, 2020, then "this Amendment shall be null and void in its entirety, and all rights and remedies of the parties hereto shall be exactly the same is if this Amendment were never prepared and executed."

63. CMG refused to sign amendment as revised by Parvizi. Rather, CMG's counsel admitted that, while the company was hopeful that it would close on third party financing by July 24, 2020, it might not receive the proceeds of the financing until the following week. Therefore, despite the draft amendment that *it* sent providing for a July 24, 2020 Final Closing, the company would not commit to such a date. It sent the amendment to Parvizi in bad faith, knowing it could not perform, hoping that Parvizi's signature on it would further extend the company's closing obligation long enough to bolster an argument that the company's unexpected untimeliness in closing (compared to Final Closing of July 24, 2020, as opposed to June 15, 2020) would be immaterial.

64. Indeed, on July 24, 2020, the date to which CMG had asked Parvizi, by

amendment, to postpone the Final Closing, CMG wired no money.  CMG's counsel admitted that, even if CMG were to secure third party financing (which it still had not done), CMG still would not perform the Agreement (and deliver the remaining $7,000,000 to Parvizi) *unless and until* Parvizi executed an amendment to the Agreement postponing the Final Closing—which Parvizi had, and has, no obligation to do.

65.    At that point, more than two months after the company originally had originally committed to wire him the stock purchase price (on May 15, 2020) in the March 24 Agreement and more than five weeks after the Final Closing date (June 15, 2020) in the Signed Agreement, Parvizi had had enough.   Among other things, the Nasdaq Composite Index that had closed at 6,860.67 when the deal was struck closed at 10,363.18 on July 24, 2020.  The Index, a proxy for the value of CMG's shares, had increased by over 51% in the span of 4 months (an annualized increase of over 150%), and yet CMG was demanding that Parvizi accept the same purchase price for a deal that CMG had not performed and which shares had become far more valuable during the time of CMG's non-performance.  Parvizi's counsel informed CMG's counsel that Parvizi would not be signing any amendment to the Agreement.

66.    In the early morning hours of July 29, 2020 (more than six weeks after the company failed to perform on the date, June 15, 2020, when it had committed in the Signed Agreement to pay $7,000,000 of the $10,000,000 purchase price), CMG's counsel e-mailed to Parvizi's counsel that, finally, the company "is scheduled to close the financing tomorrow, July 29, 2020, and is *now* prepared to deliver by wire transfer" the balance of the Purchase Price ($7,000,000) on July 30, 2020, *provided that* Parvizi first sign and return the First Amendment to Stock Repurchase Agreement attached to his e-mail, in principal part, amending the Signed Agreement to defer the company's closing obligation to July 30, 2020 (from June 15, 2020). Parvizi's counsel reiterated that Parvizi was under no obligation to, and would not, execute an amendment to the Signed Agreement.

67. On July 30, 2020, CMG did not wire any funds to Parvizi.

68. Today, CMG remains unready, unwilling and unable to consummate the transactions contemplated in the Signed Agreement as written—due to no breach or other fault on the part of Parvizi.   Moreover, any tender of performance now would be rejected.

**E.   <u>Grounds for Rescission</u>**

69. The parties' communications and dealings, both before and after entering into the March 24 Agreement and executing the Signed Agreement, made crystal clear (i) that a fundamental basis of the parties' bargain (under which Parvizi agreed to sell the vast majority of his equity at a depressed price), was timely receipt of the purchase price, (ii) that, in other words, time was of the essence, and (iii) that, therefore, the company's failure to consummate the stock repurchase on or before the final closing date (of initially May 15, 2020, and then June 15, 2020) would be a material breach of the parties' agreement.

70. CMG materially breached the parties' agreement(s) by delivering no more than $3,000,000 of the agreed-on $10,000,000 purchase price for so much of Parvizi's preferred stock as to leave him owning 9% of the company's equity on a fully diluted basis, delivering no money after May 20, 2020 and failing to consummate the transaction on or before June 15, 2020.

71. Further CMG has indicated, by both its words and conduct, that it is unable to perform the terms of the parties' agreement(s), unless and until Parvizi executes a written amendment to the Signed Agreement that would materially would alter the terms of the parties' agreement, which amendment Parvizi is under no obligation to, and which he has indicated he will not, execute.

72. Parvizi has not been provided with any stock powers to sign, and has not signed any stock powers, transferring to CMG any of his preferred stock that is the subject of the parties' agreement.

73. The consideration that Parvizi was promised in his agreement(s) with

CMG for the sale of preferred stock in the company (and for the litany of investor rights forfeitures that CMG's counsel included in the Signed Agreement) has failed, in whole or part, due to the fault entirely of CMG and due to no fault of Parvizi.

74.    That the consideration for the provisions in Articles 3 through 7 of the Signed Agreement was the *full and timely* payment of Parvizi's shares of preferred stock is clear.  Last year, pursuant to a written agreement that CMG's counsel also prepared, Parvizi sold 12,546,683 shares of Series Seed Preferred Stock to CMG for a total of $4,000,000—more shares and at a higher price than that at which the parties agreed to transact the Initial Purchase pursuant to the Signed Agreement.  The company included *none* of the onerous forfeiture of rights—included, without discussion, in the Signed Agreement (in connection with which Parvizi had no counsel)—for that sale, making clear that only the consideration for paying $10,000,000 for so many of Parvizi's preferred stock as to leave him owning 9% of the company's equity on a fully diluted basis on or before June 15, 2020 served as the same consideration for Articles 3 through 7 of the Signed Agreement.

75.    Parvizi's assent to the agreement(s) also was procured by fraud, mistake and duress, exercised by or with CMG's connivance.  The comprehensive record of texts and e-mails between the parties confirm that the company set out to, and did, take advantage of its largest outside investor's dire liquidity needs in order to induce him—knowing he was unrepresented by counsel—to sell so many shares of his preferred stock as leave him with 9% of the company's equity on a fully diluted basis and to forfeit valuable investor rights on the promise of a prompt payment of a total of $10,000,000, which the company knew, or had reason to believe, it could not fulfill.

76.    Moreover, the shares that Parvizi agreed to sell in the agreement(s) are far more valuable than they were when the agreement(s) that CMG has been unable to perform were struck.

77.    Since July of this year, Parvizi has been engaged in a good faith effort to

resolve this dispute with CMG.  Unfortunately, that effort has proven unsuccessful. Parvizi offers to return all of the $3,000,000 he has received from the company in order to restore the parties to the respective positions they were in prior to entering into the agreement(s).

78.   Parvizi reserves all of his rights as a Series Seed Preferred stockholder of CMG and otherwise.

## FIRST CLAIM FOR RELIEF
## RESCISSION

79.   Parvizi re-alleges and incorporates by reference herein each and every allegation stated in Paragraphs 1 through 56 above, as if fully stated herein.

80.   Parvizi's consent to the Signed Agreement was given by mistake, or through fraud or duress exercised by the connivance of CMG, which included, among other things, misrepresenting and materially misleading Parvizi as to its ability to close and fund the transaction timely, misrepresenting and materially misleading Parvizi regarding its ability to close the transaction at all, and taking advantage of Parvizi's dire liquidity needs and the fact that he was unrepresented by counsel, to transact at an opportunistically low share price and to include terms in the Signed Agreement that were never discussed or negotiated and which, if binding, would effectuate a significant forfeiture of Parvizi's valuable investor rights.

81.   Parvizi's consent to the March 24 Agreement similarly was given by mistake, or through fraud or duress exercised by the connivance of CMG, which included, among other things, misrepresenting and materially misleading Parvizi as to its ability to close and fund the transaction timely, misrepresenting and materially misleading Parvizi regarding its ability to close the transaction at all, and taking advantage of Parvizi's dire liquidity needs and the fact that he was unrepresented by counsel, to transact at an opportunistically low share price and to include terms in the Signed Agreement that were never discussed or negotiated and which, if binding, would effectuate a significant forfeiture of Parvizi's valuable investor rights.

82.     CMG has not fully or substantially performed its obligations under either the Signed Agreement or the March 24 Agreement by, among other things, failing to deliver $7,000,000 of the agreed-upon $10,000,000 purchase price.

83.     The primary consideration for which Parvizi bargained under the Signed Agreement and the March 24 Agreement—namely $10,000,000 paid, in full, by no later than June 15, 2020—has failed entirely due to the fault of CMG and due to no fault by Parvizi.

84.     Parvizi is, therefore, entitled to, rescission of the Signed Agreement, and, in the absence of the Signed Agreement, the March 24 Agreement, and to judgment restoring the parties to their respective positions before entering into the agreement(s), pursuant to Section 1689 of the California Civil Code.

85.     Parvizi offers to return to CMG, upon rescission of the agreement(s), the $3,000,000 it paid to him in purported furtherance of the parties' stock agreement(s).

## SECOND CLAIM FOR RELIEF

## BREACH OF CONTRACT (CONDITIONALLY AND ALTERNATIVELY)

86.     Parvizi re-alleges and incorporates by reference herein each and every allegation stated in Paragraphs 1 through 63 above, as if fully stated herein.

87.     In the event, and only in the event, that Parvizi is not granted rescission of the Signed Agreement and the March 24 Agreement, then the parties are bound by an agreement whereby Parvizi agreed to sell to the company so many of his Series Seed Preferred Stock in CMG as to leave him owning 9% of the company's equity on a fully diluted basis, and CMG agreed to such shares of Parvizi's Series Seed Preferred Stock, for a total purchase price of $10,000,000 in a two-step transaction, the second step of which was to be consummated by CMG's delivery to Parvizi of $7,000,000 on or before June 15, 2020 (under the Signed Agreement) and May 15, 2020 (under the March 24 Agreement).

88.     In the event, and only in the event, that Parvizi is not granted rescission of the agreement(s), CMG materially breached the parties' agreement by failing to

deliver the $7,000,000 balance of the purchase to Parvizi by June 15, 2020.

89.    As a proximate result of CMG's breaches of contract, Parvizi has been injured and suffered damages in an amount to be determined at trial.

## THIRD CLAIM FOR RELIEF

## INDEMNIFICATION (CONDITIONALLY AND ALTERNATIVELY)

90.    Parvizi re-alleges and incorporates by reference herein each and every allegation stated in Paragraphs 1 through 67 above, as if fully stated herein.

91.    In the event, and only in the event, that Parvizi is not granted rescission of the Signed Agreement, the Signed Agreement provided for "each Party shall indemnify and hold the other Party harmless against and from all actions, lawsuits, proceedings, hearings, investigations, charges, complaints, demands, injunctions, judgments, orders, decrees, rulings, dues, liabilities, obligations, taxes, liens, assessments, levies, losses, fines, penalties, damages, third Party claims, costs, fees and expenses (including attorneys', accountants', investigators', and experts' fees and expenses incurred in investigating or defending any of the foregoing) ("Damages") sustained or incurred by the indemnified Party as a result of or arising from "any breach by the indemnifying Party, or failure by the indemnifying Party to comply with, any of the covenants or obligations under this Agreement to be performed by such Party" or arising from "fraud or other intentional and/or malicious conduct by the indemnifying party."

92.    Parvizi has incurred damages, including but not limited to attorneys' fees, as a result of CMG's breach of the Signed Agreement and CMG's fraud and other intentional and/or malicious conduct in falsely representing or concealing its ability and/or commitment to close and fund a $10,000,000 stock repurchase from Parvizi within the time period that the parties agreed was critical to Parvizi's willingness to agree to the terms of the transaction.

93.    In the event, and only in the event, that Parvizi is not granted rescission of the Signed Agreement, Parvizi is entitled to indemnification from CMG for all

damages, liabilities, losses, fines, penalties, costs, fees and expenses, including attorneys' fees, that he has sustained by virtue of CMG's breaches of the parties' contract, in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays this court for judgment against Defendant as follows:

A.    For rescission of each of the Signed Agreement and the March 24 Agreement;

B.    In the event rescission of the agreement(s) is not granted, for monetary damages in an amount to be determined at trial;

C.    In the event rescission of the Signed Agreement is not granted, for indemnification of all of Plaintiff's damages, liabilities, losses, fines, penalties, costs, fees and expenses, including attorneys' fees, that he has sustained by virtue of Defendant's breaches of the parties' contract, including, but not limited to, the attorneys' fees and expenses he has incurred and will continue to incur in connection with this action, in an amount to be determined at trial; and

D.    For such other and further relief as the Court deems just and proper.

Dated:  October 2, 2020                **DE CASTRO LAW GROUP, P.C.**


By: */s/ José-Manuel A. de Castro*
José-Manuel A. de Castro
Attorneys for Plaintiff Iraj Parvizi

COMPLAINT FOR RESCISSION AND ALTERNATIVE RELIEF
Case No. 2:20-cv-09059

1

## **REQUEST FOR JURY TRIAL**

2

3        Plaintiff requests a trial by jury of all issues triable thereby.

4

5    Dated:  October 2, 2020          **DE CASTRO LAW GROUP, P.C.**

6

7                            By:  */s/ José-Manuel A. de Castro*

8                                 José-Manuel A. de Castro
                                  Attorneys for Plaintiff Iraj Parvizi

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REQUEST FOR JURY TRIAL
Case No.  2:20-cv-09059