1            UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3                 WESTERN DIVISION

4      THE HON. JOHN A. KRONSTADT, JUDGE PRESIDING

5

6   IRAJ PARVIZI,                    )
                                     )
7                   Plaintiff,       )
                                     )
8         vs.                        ) NO. 20-CV-09059-JAK
                                     )
9   CREATE MUSIC GROUP, INC.,        )
                                     )
10                  Defendant.       )
    _____)

11

12

13

14         REPORTER'S TRANSCRIPT OF PROCEEDINGS

15              Telephonic Conference

16              Los Angeles, California

17              Monday, April 5, 2021

18

19

20

21

22

23         LISA M. GONZALEZ, CSR No. 5920, CCRR
                U.S. District Courthouse
24          350 W. First Street - Room 4455
              Los Angeles, California 90012
25          213.894.2979; www.lisamariecsr.com

```
 1   APPEARANCES:

 2

 3   FOR THE PLAINTIFF:     OTTERBOURG PC
                            BY:  ADAM C. SILVERSTEIN, ESQ.
 4                          230 Park Avenue
                            New York, NY 10169
 5                          212-905-3628

 6                          DE CASTRO LAW GROUP P.C.
                            BY:  JOSE-MANUEL A. DE CASTRO, ESQ.
 7                          7590 North Glenoaks Boulevard,
                            Suite 201
 8                          Los Angeles, CA 91504
                            310-270-9877
 9

10

11   FOR THE DEFENDANT:     QUINN EMANUEL URQUHART AND SULLIVAN LLP
                            BY:  HARRY A. OLIVAR, JR., ESQ.
11                               ALYSSA OLSON, ATTORNEY AT LAW
12                          865 South Figueroa Street, 10th Floor
                            Los Angeles, CA 90017-2543
13                          213-443-3176

14

15

16

17

18

19

20

21

22

23

24

25
```

1          Los Angeles, California; Monday, April 5, 2021;

2                          10:00 a.m.

3                          -o0o-

4          THE CLERK:  Calling item number six, CV-20-9059,

5     Iraj Parvizi versus Create Music Group, Inc.

6          Counsel, when I call your name, please reply in

7     the affirmative that you are present.

8          Adam Silverstein.

9          MR. SILVERSTEIN:  Present.

10         THE CLERK:  And Jose Manuel de Castro.

11         MR. DE CASTRO:  Present.

12         THE CLERK:  And for the defendants, Harry Olivar.

13         MR. OLIVAR:  Present.  Good morning.

14         THE CLERK:  And Alyssa Olson.

15         MS. OLSON:  Present.  Thank you.

16         THE CLERK:  Your Honor, we are ready to proceed.

17         THE COURT:  Thank you.

18         Good morning, Mr. Silverstein, Mr. De Castro,

19     Mr. Olivar and Ms. Olson.

20         We are proceeding today telephonically; however,

21     the rules which apply to today's hearing are the same as if

22     all of us were together in the courtroom, something that we

23     all hope to resume soon, and those include that there are to

24     be no recordings made of any of today's proceedings whether

25     audio, video or otherwise.

4

1          If any person were to make a recording of any type

2    of any portion or all of today's proceedings, it would be in

3    violation of a Court order.

4          In addition, because the court reporter, who will

5    be creating the transcript of today's proceeding, cannot see

6    each of you, please identify yourself by name each time that

7    you begin speaking.  It doesn't mean if we are in a colloquy

8    you have to re-identify yourself each time you answer a

9    question, but at the outset of each time you're speaking,

10   please identify yourself by name.

11         And please speak a little more slowly than we all

12   tend to speak on telephone calls, again, so the court

13   reporter can get your words.

14         We are here today on the defendant's motion to

15   dismiss pursuant to 12(b)(6) and 9(b) or, in the

16   alternative, to strike pursuant to Federal Rule 12(f)

17         I -- just a moment.  One moment, please.

18         I've reviewed your briefing.  Thank you for your

19   helpful briefing.

20         My tentative views, which I will relay to you as

21   tentative views, are these:  In a pleading -- the challenge

22   pleadings which are the basis for the fraud and the related

23   claims to eliminate the obligations of the plaintiff under

24   the agreement are -- do, under the fraud prong, under

25   Rule 9(b) as you stated, do require specificity.

1        And specificity in articulating a claim for fraud,

2   among other things, requires the who, what, when, and where

3   of the alleged misleading communication; meaning what was

4   said, by whom was it said, and where was it said, and in

5   what context.  And that's not the only, of course, elements

6   of a fraud claim.  There has to be reasonable reliance and

7   injury, but I think that the current challenge is focusing

8   on those elements.

9        In reviewing the complaint -- and there are

10  certain e-mails that are referred to in the complaint and

11  the defendant has offered some additional ones in connection

12  with the motion which relate to the ones in the complaint,

13  so I think they can also be considered on the motion to

14  dismiss for purposes of completeness.  Those communications,

15  as well as the other allegations of the complaint, I think

16  do detail the who spoke, when was the speaking, what was

17  stated elements of the claim for fraud, or they would also,

18  as I said, support a claim for rescission.

19        There are and in addition to these specific

20  statements and in light of the defendants -- and the

21  defendants have correctly argued that you cannot convert any

22  breach of contract claim into a fraud claim simply by

23  alleging nothing more than there were these communications.

24  There has to be the elements that you intended to mislead,

25  and you knew that what you were communicating was not true.

1          But in that regard, I'm focusing on the following

2    paragraphs in the current complaint, which are

3    paragraphs 17, which is referring to the specific e-mail

4    exchange where it is alleged that there was not a disclosure

5    that the defendant did not have the ability to pay the

6    $10 million for the shares.

7          There's also later in the complaint following a

8    detailed -- many of these detailed factual allegations in

9    connection with the claim for rescission.

10          For example, in paragraphs 80 and 81, there are

11    again -- excuse me.  I beg your pardon.

12          First, in paragraph 75, there are allegations

13    that -- referring back to those that preceded it -- that

14    there was -- the plaintiffs assent was procured by fraud,

15    mistake, duress, and there's reference to the text, e-mails

16    and communications that had occurred.  And there are similar

17    allegations in paragraphs 80 and 81, which standing alone

18    would be -- could be deemed conclusory allegations of the

19    alleged, fraudulent statements and which would support

20    rescission, but they are incorporating by reference.

21          So in reviewing this, my tentative view is that

22    the complaint does adequately state and meet the standards

23    of Rule 9(b), as well as 12(b)(6) in stating a claim because

24    of the detail it has provided and because of the nexus in

25    the complaint to that detail with the allegations that this

1  was not -- these were statements that were knowingly made

2  and where allegedly the party making the statements knew

3  that, for example, allegedly that the defendant could make

4  the payments on these amounts without borrowing and similar

5  things.

6          Now, there are also, of course, allegations in

7  this complaint as to when the plaintiff left the board of

8  directors, which is in the course of some of this conduct,

9  but that's a different issue in terms of reasonable

10  reliance, for example, with respect to the borrowing member

11  of the board of directors.  It may affect the ability -- not

12  ability, but it may affect the application of the standard

13  of reasonable reliance, but not on a motion to dismiss.

14  That's not the time for that, nor has that argument been

15  presented in that fashion.

16          So my tentative view is that I would find the

17  complaint sufficient, and I would find that there would not

18  be substantive value in requiring a new complaint which

19  linked together the paragraphs to which I referred.

20          So with that in mind, Mr. Olivar, Ms. Olson, who

21  will be addressing these issues for the defendant today?

22          MR. OLIVAR:  Your Honor, Ms. Olson will.

23          THE COURT:  Ms. Olson.  And that was Mr. Olivar;

24  correct?

25          MR. OLIVAR:  Yes, that's correct.

```
 1              THE COURT:  Ms. Olson, let me hear from you.
 2              MS. OLSON:  Yes, Your Honor.  So I think if you
 3    look at the paragraphs that you cited, for example,
 4    paragraph 17, that is referencing the e-mails described in
 5    paragraphs 14 through 16.  And I think in those paragraphs,
 6    paragraph 14, specifically, that is one of the e-mails where
 7    the fact that debt will be needed to complete the
 8    transaction was actually disclosed; and, I think, one of the
 9    examples of why this -- why the complaint is inadequate.
10              The very last sentence of paragraph 14,
11    Mr. Strauss, who is from Create Music Group, is telling
12    Mr. Parvizi that if this deal works, he would approve the
13    debt side right away and get that moving fast.  This is
14    around March 24th, 2020, more than a month before the
15    agreement is eventually signed.
16              And --
17              THE COURT:  Excuse me.  I'm sorry for
18    interrupting, Ms. Olson, but in paragraph 14, what is the
19    language that you're referring to when you say "discloses
20    debt"?
21              MS. OLSON:  So this would be in the very last
22    sentence of paragraph 14, starts with:  "I think this is a
23    win-win for everyone.  And if it works, I'll approve the
24    debt side right away to get that moving fast."
25              THE COURT:  Okay.  Just a minute.
```

```
1           All right.  Thank you.  That's helpful.
2           MS. OLSON:  And then also in paragraph 33, there's
3   another communication that's described, which is also again
4   before the agreement is signed where Mr. Strauss tells
5   Mr. Parvizi that the closing date would be all based on the
6   lender.
7           So I think -- although there are a lot of -- as
8   you mentioned, Your Honor, there are a lot of quoted
9   statements in the complaint, none of them are -- they
10  haven't identified any that are false.  And the ones that
11  they have included show that the fact that the payment would
12  be -- would be based on a lender were disclosed before the
13  agreement was signed.
14          And so the combination of these detailed -- of
15  these quotes from these communications are not tied to what
16  I think you correctly identified as the later conclusory
17  statements alleging that these statements -- that these
18  statements, either were false or did not include statements
19  of disclosure.
20          And I think, regarding your second point about,
21  you know, about what is the harm or what would be the reason
22  to require them to replead to either get rid of or have
23  another chance to substantiate their claim, which we think
24  they won't be able to do, is that, you know, CMG's business
25  requires that its thousands of artists that it represents
```

1   and the labels that it represents trust them to manage their

2   financial transactions and the way that they monetize their

3   music.  So these unsupported allegations of fraud undermine

4   their core business, which depends on the trust of their

5   clients.

6           And so I think our motion really seeks to focus

7   the complaint on what this case is, and what it should be,

8   which is a contract dispute about whether the delay in

9   making the $7 million payment in a share or purchase

10  contract that does not say time is of the essence was a

11  material breach sufficient to rescind the contract, or

12  whether the contract should be enforced.

13          And I think -- and in addition to whether there

14  are statements that allege what was said or what was

15  omitted, there needs to be allegations that there was

16  something more than non-performance to establish fraudulent

17  intent.  And the complaint does not have any of the typical

18  something more which the plaintiff in their opposition gives

19  as examples, insolvency, hasty repudiation of the promise,

20  failure to attempt performance or assurances after it was

21  clear they would not perform, which are all not applicable

22  here and not alleged in the complaint.

23          And, in fact, the complaint, in paragraph 36,

24  alleges that as of May 6th, the date the share re-purchase

25  agreement was signed, CMG believed, although wrongly as it

1  turned out, that it could fulfill its written closing

2  obligation as of the date the agreement was signed.  And

3  that alone also dooms the allegation.

4          THE COURT:  I understand.  That's helpful.  Thank

5  you.

6          Who will be addressing this for the plaintiff?

7  Mr. Silverstein.

8          MR. SILVERSTEIN:  Yes, Your Honor.  Your Honor,

9  Adam Silverstein.  I'll be addressing the motion for the

10  plaintiff.

11          THE COURT:  Thank you.  Go ahead, Mr. Silverstein.

12          MR. SILVERSTEIN:  Your Honor, we appreciate

13  Your Honor's tentative thoughts on the motion.  I think much

14  of what Ms. Olson argued has been addressed in the papers,

15  so I'll try to be brief.

16          Your Honor, first, just so that we have a little

17  bit of clarity and context here, this isn't a matter of a

18  delay of making a $7 million payment.  The payment still

19  hasn't been made, so there has been continued

20  non-performance now almost a year after the agreement was

21  signed.

22          The complaint alleges that the company agreed to

23  buy $10 million of shares from its first and major outside

24  investor and to pay that $10 million by June 15th.

25          In return for that promise to pay, there were

1  concessions that were significant extracted right upfront,

2  including resignation from the board and forfeiture of

3  significant preferred stockholder rights.  And yet the

4  company did not have the ability when it entered into the

5  agreement it is alleged to perform that promise to pay, and

6  it did not disclose its inability to its stockholder of its

7  inability to pay.

8          And in the motion papers that the defendant filed,

9  it seems to suggest that this is some new theory that was

10  articulated in plaintiff's opposition papers.  In fact, the

11  theory is in the first opening paragraphs of the complaint.

12          Paragraph one states:

13          "After seizing on the pandemic-related

14          financial distress, one of its major stockholders,

15          plaintiff, and only states company, defendant,

16          knowing or recklessly disregarding the fact that

17          it did not have the ability to perform induced the

18          stockholder to sell back the vast majority of his

19          shares to the company at an opportunistically low

20          price."

21          Then, in paragraph three of the complaint, states:

22          "Unbeknownst to plaintiff at the time that it

23          originally entered into this stock re-purchase

24          agreement, defendant did not have the ability to

25          perform it; rather defendant, without telling

1          plaintiff at the time, needed to procure millions

2          of dollars of third-party financing in order to be

3          able to pay for the shares that it agreed to

4          purchase.

5               "More, even though defendant subsequently

6          prepared the terms of the written memorialization

7          of the agreement without any negotiation or input

8          from the plaintiff, defendant did not provide for

9          any contingency for any third-party financing in

10         the written agreement.  Defendant did, however,

11         use the opportunity of unilaterally drafting a

12         long-form agreement to include numerous provisions

13         that it had never discussed with plaintiff, by

14         which plaintiff, who was unrepresented by counsel,

15         conditionally waived a number of valuable investor

16         rights under the preferred stockholder agreement

17         governing his share ownership in the exchange for

18         the unfulfilled consideration defendant had

19         promised him."

20              So the fraud theory and the fraud allegations are

21    nothing new.  They were -- they're in the opening paragraphs

22    of the complaint.

23              And the issue, Your Honor, although I understand

24    that these will be fact issues to be determined at trial,

25    the issue is not some oblique reference in an e-mail to

1   approving debt side, whatever that means, it's whether the

2   company had the debt in place to close on this transaction

3   when it agreed to pay.

4           And I understand Your Honor can't consider this

5   technically on the motion, but the discovery has shown --

6   and we mention this in the papers -- that the defendant had

7   not even reached out to a loan broker to procure financing

8   by the time that it had agreed to promise to pay the

9   $10 million.

10          So we respectfully agree with Your Honor's

11  tentative ruling.  We disagree with Ms. Olson's arguments.

12  We submit that we've addressed them in the opposition

13  papers.

14          And to the extent that the defendant wishes to

15  argue that Mr. Parvizi had information that was acceptable

16  to him, those are fact issues to be determined at trial, not

17  appropriate for the Court to determine at the pleading

18  stage.

19          We appreciate the Court indulging us, and we thank

20  the Court for its attention to this matter.

21          THE COURT:  Thank you, Mr. Silverstein.

22          Let me just ask you this.  Would you turn to

23  paragraph 36, which has been discussed in the briefing and

24  which Ms. Olson mentioned again today.

25          MR. SILVERSTEIN:  I'm turning to it, Your Honor.

1   Yes.

2          THE COURT:  It's where it's alleged -- this is

3   plaintiff's point -- "The following day, CMG believed

4   (wrongly as it turned out) that it could fulfill" --

5          Now, how is that consistent with your contention

6   that CMG knew from the beginning that it couldn't get the

7   lending or didn't know, or why is this a concession by

8   plaintiffs that it was a mistake as opposed to an

9   intentional act?

10          MR. SILVERSTEIN:  Your Honor, we address this on

11   pages 15 and 16 of our opposition brief.  And I'm going to

12   answer the Court's question, but I also want to refer the

13   Court to those sections of our opposition brief because we

14   addressed that in writing.

15          But the answer, Your Honor, is twofold.  First,

16   the allegation, in our view, does not negate that the

17   company had an affirmative duty to disclose to its

18   stockholder the facts concerning its ability to obtain

19   financing, which as mentioned, the company had not -- had

20   not even begun to reach out to a loan broker.  So this was

21   nothing more than a speculative hope.

22          And the second aspect of this is, Your Honor, I

23   think the allegation is actually -- as we mentioned in our

24   opposition, the action is also unduly creditable to the

25   defendant.

1          In other words, the obligation, as it's turned

2    out, has turned out to be not even true in that the company

3    did not have any clue that it was -- whether it was going to

4    be able to get financing when it signed the agreement.  So

5    the allegation gives the company the benefit of the doubt

6    that it wouldn't sign until it had some belief that it could

7    close but that turns out not to even be the case.

8          So, Your Honor, to the extent that this allegation

9    sits in contrast to the general overall allegations of the

10   complaint, we would say that that's -- it creates, perhaps,

11   an issue of fact, but it doesn't undermine and defeat, you

12   know, all the other allegations in the complaint.

13         And if we were asked to replead, Your Honor, in

14   light of the evidence that we now have seen, we'd actually

15   just take that allegation out.  It's not necessary.  And as

16   it's turned out, it's not even -- it was pled based on a

17   belief, but as it's turned out, it wasn't even accurate.

18   The company signed the agreement without even having any

19   belief that it could close at that point.

20         THE COURT:  You did address this briefly, but with

21   respect to Ms. Olson's reference to paragraph 14 of the

22   complaint, the last portion of the e-mail.

23         Do you see that?

24         MR. SILVERSTEIN:  Your Honor, I'm just pulling to

25   it right now.  Paragraph 14.  That's the reference to the

1    debt side?

2         THE COURT:  Correct.  You alluded to that earlier.

3    How is that consistent with the company was failing to

4    disclose that it would need to borrow to make these

5    payments?

6         MR. SILVERSTEIN:  Right, Your Honor.  So I

7    actually don't even know what that reference is referring

8    to:  "I think this is a win-win for everyone.  And if it

9    works, I'll approve the debt side right away."  I don't know

10   what that's referring to, and I can tell you that my client

11   doesn't understand what that refers to either.

12        But, Your Honor, regardless of whether there's

13   some oblique reference to debt, the question is not whether

14   this was going to be paid for by cash on the balance sheet

15   or debt, it was whether it was going to be paid for.

16        And this -- if anything, this implies that there

17   was debt that was available to be approved and the reality,

18   Your Honor, is that the company had nothing but a

19   speculative hope that it would be able to obtain $7 million

20   which to our understanding it hasn't obtained, it didn't

21   pay, but whether -- this reference to debt does not

22   undermine the fact that the company never disclosed that it

23   had nothing but a speculative hope of obtaining the debt

24   that was needed, how much debt, when it was going to obtain

25   it, and that it was speculative at this point.

1    So, again, I think this potentially raises a fact

2  issue, Your Honor, as to what this reference is, but we

3  respectfully submit it doesn't defeat the claim at this

4  point as to whether the company disclosed its ability to

5  close on June 15.

6    THE COURT:  Let me add a related matter.  I

7  mentioned it in my comment, that reasonable reliance as to a

8  board member may be different than reasonable reliance as to

9  somebody who's not on the board.  And I recognize from what

10  I said these are fact questions.  But is it your position

11  that, as a member of the board, this plaintiff would not

12  have known sufficient amount about the defendant's financial

13  position to know -- have a view as to its ability to make

14  these payments?

15    MR. SILVERSTEIN:  Yes, Your Honor, that's right.

16  In fact, after we received defendant's reply papers, we

17  served an interrogatory questioning the company about board

18  information and board meetings, and the company confirmed

19  what we had already known, is that there was never any board

20  meeting and I don't believe ever any stockholder meeting in

21  the company's history during the time of Mr. Parvizi's

22  investment.  He was on the board, and every board action was

23  taken by written consent, by unanimous written consent.

24    As he states in numerous e-mails that are quoted

25  in the complaint, he placed his trust in the CEO and

```
 1   founder, Mr. Strauss, and whether that's -- raises questions
 2   about whether he fulfilled his duty as a board member or
 3   not, that's a separate question and a fact question.
 4            But for purposes of this, Your Honor, he did
 5   not -- he never received any information about any financial
 6   statements, any financial information.  There were no board
 7   meetings.  He was dependent on what he was told by
 8   Mr. Strauss.
 9            THE COURT:  All right.  Thank you,
10   Mr. Silverstein.
11            Ms. Olson, is there anything you'd like to add at
12   this point?
13            MS. OLSON:  Yeah, just a couple of things I'd like
14   to address.
15            The first is that Mr. Silverstein made the point
16   of saying payment has still not been made, and I just wanted
17   to clarify that the remaining $7 million was offered in
18   July, and CMG has been ready, willing and able to close
19   since July and Mr. Parvizi has refused to close.  And we've
20   produced evidence showing the current availability of the
21   $7 million from July until today.
22            THE COURT:  That was conditioned upon an amended
23   version of the agreement being executed; correct?
24            MS. OLSON:  Not exactly, Your Honor, but I
25   think -- that's a factual point, but, in part, the agreement
```

1   itself required certain representations and warranties to be

2   agreed to as of the date of the outside closing and that was

3   part of what did not happen at the end of July when the

4   $7 million was offered to be paid.

5          THE COURT:  Go ahead.

6          MS. OLSON:  I think the second kind of point is

7   that Mr. Silverstein referenced that the contract with the

8   loan broker was not signed until after the agreement itself,

9   but as the rest of the evidence shows, there were numerous

10  other banks that Create Music Group was discussing months

11  prior to that; and so I think, to the extent that they're

12  relying solely on this one broker as saying that that

13  agreement was in place I think misstates all the evidence

14  that's been produced.

15         And I think, most importantly, and to the extent

16  that they are using some of this other evidence to state

17  that the ability to get debt by a certain date was

18  speculative, I think we addressed this in a couple of

19  places, but especially in our reply brief citing to the

20  *Magpali* case that describes how even if the belief was

21  speculative or they weren't 100 percent sure that they would

22  be able to close the loan by a date certain is not

23  sufficient to allege fraudulent intent if the belief was

24  honest that they would be able to close on time.

25         And there's no allegations in the complaint that

1   there wasn't an honest belief that they would be able to

2   close on time and the allegation to the contrary, which

3   Mr. Silverstein says he would now withdraw, but in the

4   complaint that we're considering here today it includes that

5   allegation.

6           THE COURT:  Thank you, Ms. Olson.

7           Just a minute.

8           Thank you for your help today, and I will issue a

9   written ruling.

10          Are you making any efforts to try to resolve this

11  case informally?  And I'm not asking for substantive

12  discussions, just have you started any kind of a process.

13          Mr. Silverstein?

14          MR. SILVERSTEIN:  Your Honor, Mr. Olivar and I

15  spent some time last summer and early fall, before the

16  action was commenced, to try to resolve this, and we were

17  unsuccessful.  And so it was only after we had made efforts,

18  I would say good faith on both sides, that we filed this

19  complaint.  Since then, there haven't been any discussions.

20  When this motion was filed, I raised the possibility of

21  trying to revisit this, and I haven't heard back.  And I'm

22  not faulting Mr. Olivar suggesting somehow that it's been

23  sitting in his lap, but the subject hasn't been broached by

24  either party since then.

25          So that's where we are, Your Honor.  We've been

1   focused on discovery, both sides.  I think, you know, I

2   think we're more informed now than we were, and that's where

3   we are at the moment, Your Honor.

4              THE COURT:  All right.  Thank you,

5   Mr. Silverstein.

6              Mr. Olivar, Ms. Olson, just procedurally, did you

7   want to comment on what process may make sense in terms of

8   trying to resolve this matter?

9              MR. OLIVAR:  Your Honor, Mr. Silverstein is

10  generally correct.  Harry Olivar.

11             THE COURT:  Thank you, Mr. --

12             MR. OLIVAR:  It may make sense to have a mediation

13  at some point.  Our client would like to conclude this

14  transaction, either entirely or a material part, but we

15  haven't discussed the process yet.

16             THE COURT:  Well, I think counsel -- if counsel

17  would continue to discuss that, and if you think, for

18  example, that working with a neutral would be valuable or

19  magistrate judge, discuss that if you think -- I'm sure you

20  both have plenty of views on able, private neutrals.  You

21  can discuss those.

22             As I said, if you prefer to work -- or you think

23  it would be more productive to work with a magistrate judge,

24  then let me know, and we can work with you on that.  But I

25  think -- I urge you both to keep open minds and continue

1  your collaborative discussions.  Find a path that's

2  independent of this motion.  If the motion is granted, there

3  presumably will be a new complaint, and there will be new

4  discussion about potentially a new motion to dismiss.  If

5  the motion is denied, you're going to pursue other things.

6  So it's always a good idea to talk about trying to resolve

7  things.

8          Other than that, is there anything else we need to

9  do today?

10          Mr. Silverstein?

11          MR. SILVERSTEIN:  Your Honor, there is one other

12  matter that I would like to raise to the Court, which is a

13  scheduling conference.  I'm happy to report to the Court

14  that the parties have made progress in moving forward with

15  discovery, and I think our expectation is that we will, you

16  know, substantially complete document discovery some time

17  this month, and we'll be poised to start depositions.  And I

18  think, you know, perhaps, we start depositions might be an

19  opportune time -- if there's going to be some discussion

20  about resolution, that might be an opportune time.

21          But be that as it may, the parties' progress has

22  been mutual, but it also has been, I think, with a fair

23  amount of letter writing and threats of seeking court

24  intervention on both sides.  And I think we're at a point

25  where it would be helpful to have some court deadlines and

1    supervision to help us get to the end line on this within a

2    reasonable time period.

3              So I don't know what the Court's thoughts are on

4    having a formal scheduling conference and getting an update

5    with the magistrate on where we are and what needs to be

6    done to finish discovery, but I think that might be helpful.

7              THE COURT:  Just a minute.  Just a moment, please.

8              T.J., do we have an estimated date for the

9    scheduling conference?

10             THE CLERK:  Just a moment, Your Honor.

11             Your Honor, I do not believe one has been

12   scheduled.  But I can do so, and it looks like it would be

13   -- if I issue one today, it would be scheduled for

14   June 21st.

15             MR. OLIVAR:  Your Honor, Harry Olivar.  May I

16   respond for a moment?

17             THE COURT:  Yes, Mr. Olivar.

18             MR. OLIVAR:  I think we'll have more discovery in

19   this case before an answer and counterclaims and pleadings

20   being finaled than any case I've experienced, and things

21   seems to be moving along.  I think typical to wait for at

22   least the answer to any counterclaims that may be responsive

23   to those before scheduling conference.

24             That said, if Your Honor wants to schedule one, we

25   can.  Although, normally, in my experience, the pleadings

1  have been filed before we try to do that, but I'll leave

2  that to Your Honor and your clerk.

3          THE COURT:  Mr. Olivar, do you agree that the

4  written discovery is largely completed?

5          MR. OLIVAR:  I think so.  I think we're chasing

6  down the tail end of our document production, and we have

7  some issues with what plaintiff has produced.  But both

8  sides have made a good-faith effort to produce a volume of

9  material, and we're talking about depositions in May and

10  June.  So we're really moving along our discovery even

11  before our answer --

12          THE COURT:  Okay.  Just a minute.

13          And, Mr. Olivar, have you and Mr. Silverstein or

14  any other team, group, from the case discussed the

15  approximate number of depositions that are contemplated?

16          MR. OLIVAR:  Not beyond the ten deposition limit

17  in the federal rules.  I don't think either side has made

18  any sort of formal request to expand that.  And looking at

19  our side, we may be able to do that.  We're still counting

20  the ones that we think we need.

21          THE COURT:  Who's speaking, please?

22          MR. SILVERSTEIN:  I'm sorry.  It was

23  Adam Silverstein.  I didn't mean to interrupt the Court.

24          THE COURT:  That's all right.  Go ahead.

25          MR. SILVERSTEIN:  I was just going to add,

1  Mr. Olivar -- it was Good Friday, and Mr. Olivar may not

2  even be aware, but Ms. Olson and I had a conversation on

3  Friday about witnesses and depositions, both non party and

4  party.  We went over all the names that are out on the

5  table.  And currently, if every deposition was taken, it

6  would be, I think, slightly more than ten.

7          But I think there was a recognition on both

8  parties' parts that not every deposition that's been

9  requested would be needed, depending on if, for example,

10  parties who identified witnesses in their initial

11  disclosures weren't actually planning on calling them as

12  witnesses at trial, that may obviate the need for

13  depositions by the other side and the like.

14          So we have a universe, and we have non party

15  subpoenas that we've served that are ready, you know,

16  depositions are ready to be scheduled.  And from my

17  conversations with Ms. Olson on Friday, I had the distinct

18  understanding that barring the unexpected, there shouldn't

19  be a reason why we couldn't begin depositions in May and

20  have them completed by the end of June.

21          THE COURT:  Ms. Olson, do you agree with that?

22          MS. OLSON:  We had discussed that.  I had said it

23  kind of depended on scheduling and additionally once we do

24  get our pleadings final and we file our cross-complaint, I'm

25  not sure if additional witnesses may need to be included.

1          And as well, we hadn't discussed this, but there
2    are some potential foreign witnesses in this case that may
3    extend the timing for depositions depending on whether we
4    need to use the Hague Convention or other means.
5          THE COURT:  You just said cross-complaint.  Did
6    you mean that with respect to presently a non party, or did
7    you mean counterclaim?
8          MS. OLSON:  Sorry, Your Honor.  I meant
9    "counterclaim."
10          THE COURT:  Here's what I'd like you to do.  It
11    sounds like you're working collaboratively and making good
12    progress, so what I'd like you to do is this.  I'd like you
13    to meet and confer and then on or before -- just a moment.
14          Two weeks from today, April 19, I'd like you to
15    file a truncated version of the required Rule 16 report by
16    my standing order.  It may be -- what do I mean?  What I
17    mean is part of that standing order requires you to complete
18    what's called a Schedule A, which is where you have the
19    various events in the case and the parties have the ability,
20    each party, to provide a proposed deadline, you can agree on
21    one, and there's a third column where I will select or
22    insert a date.
23          So I'd like you -- when I say "truncated," I
24    don't -- in light of the progress that you've made, I don't
25    need the same -- you're permitted to, if you wish, to

1   describe the nature of the case, but I understand the case,

2   at least from this motion.  Now I don't know about the

3   counterclaim, of course.  It's not been filed.  I'm just

4   trying to make it easier for you.  You're not restricted in

5   terms of what's included in this report in two weeks but

6   recognize that in light of what's been briefed already on

7   the motion to dismiss, you can probably do in a more summary

8   fashion some of the descriptions.

9         With respect to the witnesses, you've already

10  identified them, so it's useful to have them identified for

11  me in the report so that in the event, for example, that I

12  recognize a witness, it's brought to my attention sooner

13  rather than later.

14        And then another part of that report, going back

15  to something I raised earlier, is when would it be

16  productive to try to resolve the case and by what method.

17  So that's another thing you can revisit in the revised

18  report.  Not revised -- excuse me, in the report.  What I'll

19  do then, we will schedule a scheduling for June, that's just

20  the norm, but upon receiving this joint report, I'll

21  determine whether issuing a scheduling order is something I

22  can do prior to the -- just taking the scheduling conference

23  under submission -- and I might issue a scheduling order

24  depending on what I read in your joint report.

25        But, frankly, it sounds like you're working

1    collaboratively, and making good progress.  I think that --

2    keep that work up, and I will review your report.

3            Does either side contemplate the need for any kind

4    of a discovery referee?  Not that I've heard anything to

5    that effect.

6            Mr. Silverstein?

7            MR. SILVERSTEIN:  At this point, Your Honor, I

8    would say no, only because, as Your Honor has pointed out,

9    parties, through their own efforts, have really limited

10   what's at issue in terms of disagreements over discovery,

11   and I'm hopeful that we can get through it without the need

12   for one.  But I'd be interested to hear what Ms. Olson,

13   Mr. Olivar have to say.

14           THE COURT:  Mr. Olivar, Ms. Olson.

15           MR. OLIVAR:  Your Honor, Harry Olivar.  I agree.

16   Not at this point.  If we ever got to that point, we would

17   request it.

18           THE COURT:  Just one last point before I let you

19   go.  As I did mention earlier and you both acknowledged that

20   efforts to resolve the case may be productive, as part of

21   the report I want you to file in two weeks, you will be

22   asked to state the proposed method of settlement discussions

23   whether it's with a member of our panel, whether it's with a

24   private neutral or whether it's with a magistrate judge.

25           To the extent that the parties both were to agree

1   that using a private neutral would be productive, then I

2   would like you to start the process of conferring about

3   private neutrals and see if you can reach an agreement on

4   one because eventually if you both think that using a

5   private neutral would be the most productive, but you cannot

6   agree on one, then I will later ask you each to submit three

7   nominees to me, and I will pick one of the six.  Not that I

8   think it's likely you'll need to do that, but start the

9   process because, as you all know, some of the more -- some

10  of the private neutrals that are in the greatest demand, the

11  sooner you can get on that person's calendar, the better.

12  You don't have to wait months.

13          Okay.  Unless there's anything else.

14  Mr. Silverstein?

15          MR. SILVERSTEIN:  No, Your Honor.  We thank the

16  Court for its attention this morning.

17          THE COURT:  Thank you.

18          Mr. Olivar?

19          MR. OLIVAR:  Nothing from our side.  Thank you,

20  Your Honor.

21          THE COURT:  Ms. Olson, anything further?

22          MS. OLSON:  Nothing from me.  Thank you,

23  Your Honor.

24          THE COURT:  All right.  Thank you.  I appreciate

25  your help today and the briefing, and I will issue a written

1    ruling.  That concludes our hearing.

2         (*Thereupon, at 10:50 a.m., proceedings adjourned*)

3

4                          -oOo-

5

6                       CERTIFICATE

7

8         I hereby certify that pursuant to Section 753,

9    Title 28, United States Code, the foregoing is a true and

10   correct transcript of the stenographically reported

11   proceedings held in the above-entitled matter and that the

12   transcript format is in conformance with the regulations of

13   the Judicial Conference of the United States.

14

15   Date:  April 15, 2021

16

17                              Lisa M. Gonzalez
                           /s/_____
18                         Lisa M. Gonzalez, U.S. Court Reporter
                           CSR No. 5920
19

20

21

22

23

24

25